**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  11-20984-CIV-ALTONAGA/Simonton**

**JASMIN COLYER**,

      Plaintiff,

vs.

**SSC DISABILITY**
**SERVICES, LLC**,

      Defendant.

_____/

**<u>ORDER</u>**

**THIS CAUSE** came before the Court upon Defendant, SSC Disability Services, LLC's

("SSC['s]") Motion for Summary Judgment ("Motion") [ECF No. 40], filed on January 18,

2012.  Plaintiff, Jasmin Colyer ("Colyer"), filed a complaint [ECF No. 1] against SSC on March

22, 2011, and an amended complaint ("Complaint") [ECF No. 12] on May 9, 2011.   The

Complaint alleges a single claim for recovery of overtime compensation under the Fair Labor

Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA").   SSC now moves for summary judgment on

Colyer's claim.   Court has carefully considered the Motion, the parties' submissions, the record,

and the applicable law.

**I.      BACKGROUND**[1]

SSC acts as an advocate for people filing claims for disability benefits with the Social

Security Administration ("SSA").   (*See* Statement of Uncontested Facts ("SUF") ¶ 1 [ECF No.

40-1]).  Freedom Disability is a division of SSC, and its revenue is generated from fees paid by

SSA if disability benefits are awarded to a client.  (*See id.* ¶¶ 2–3).  Freedom Disability's average

---

[1]  Unless otherwise noted, the facts are undisputed.

fee for a case is $2,600, and it spends on average $250 per lead as "the marketing costs involved to get to the point of talking to a potential client." (*Id.* ¶¶ 4–5). Freedom Disability spends, on average, $1,200 per client, representing the client through the initial application until a decision is made to file for reconsideration. (*See id.* ¶ 6).

Freedom Disability employs Initial Screeners who gather preliminary information from potential clients. (*See id.* ¶ 7). After the Initial Screener approves a file, a PE Authorizer reviews it again. (*See id.* ¶ 8). Freedom Disability employs Disability Advocates who work with a client to prepare applications for Social Security Disability Insurance ("SSDI") and for Supplemental Insurance Income ("SII"). (*See id.* ¶ 9). The Disability Advocates fill in the applications pursuant to SSA requirements and submit the completed applications to SSA for approval. (*See* Statement of Material Facts in Opposition ("SMFO") ¶ 9 [ECF No. 45]).

Colyer worked as a Disability Advocate from February 2009 until her termination in February 2011. (*See* SUF ¶ 10). Colyer was interviewed and hired by Evelyn Rosenthal ("Rosenthal"), Vice President of Advocacy, Government Relations and Quality Assurance, on February 20, 2009. (*See id.* ¶ 11). Colyer worked throughout her tenure at Freedom Disability in the Miami Lakes office. (*See id.* ¶ 12). Catherine Peterson ("Peterson"), a Manager of Disability Advocates, was Colyer's direct supervisor. (*See id.* ¶ 13). Peterson reported to Rosenthal, also in the Miami Lakes office. (*See id.* ¶ 14). Colyer was paid a base salary of $37,000 and was eligible for bonuses. (*See id.* ¶ 15).

Colyer's primary duty was to interact with SSC clients and the SSA, processing and submitting to the SSA as many completed applications as possible after obtaining information required by SSA guidelines. (*See id.* ¶ 17; SMFO ¶ 17). Colyer spent approximately 85% to 90% of her day interacting with or performing work for clients. (*See* SUF ¶ 18). Between early

2010 and February 2011, Colyer was regularly assigned files after an Initial Screener and a PE Authorizer had reviewed them.  (*See* SMFO ¶ 19).  Between February 2009 and early 2010, Plaintiff would also regularly make the initial phone call to potential clients to obtain information.  (*See id.* ¶ 7).  Between February 2009 and early 2010, PE Authorizers did not prescreen files Colyer worked on.  (*See id.* ¶ 8).  After Colyer received a file, she would review information noted by the Initial Screener and obtain information using SSA criteria.  (*See* SUF ¶ 20; SMFO ¶ 20).  When Colyer had any interaction with Initial Screeners, it was at the initial stage of handling a file.  (*See* SUF ¶ 21; SMFO ¶ 21).

After receiving files initially accepted by both Initial Screeners and PE Authorizers, Colyer would process applications based upon SSA criteria.  (*See* SUF ¶ 22; SMFO ¶ 22).  Once Colyer understood the information in a file, she would schedule an appointment to speak with the claimant over the phone.  (*See* SUF ¶ 24).  From the time Colyer began working at Freedom Disability until January 2010, Colyer immediately called the claimant in 90% to 95% of her cases, conducting telephone interviews.  (*See id.* ¶ 23; SMFO ¶ 23).  Her job entailed researching a claimant's condition.  (*See* SUF ¶ 25).  She would go through the "blue book," a federal publication containing SSA guidelines and application requirements, or the SSA website. (SMFO ¶ 25; SUF ¶ 26).  Colyer also asked specific questions of the client.  (*See* SMFO ¶ 25). She would do further research using Google, the Physician's Desk Reference, and medical dictionaries.  (*See* SUF ¶¶ 27–29).

Disability Advocates would conduct a greater volume of research than Initial Screeners to complete applications.  (*See* SMFO ¶ 31).  After researching the claimant's condition, Colyer would call the claimant and review all the information with him or her; she would also consult reference materials while talking to the claimant on the phone.  (*See* SUF ¶ 32).  She conducted

fact-finding interviews with professional and lay sources to secure documentation for an application.  (*See id.* ¶ 33).  Colyer's interview process was exhaustive; she would gather information on the client's technical eligibility, medical information, treatment, onset of disability, severity of illness, work history, and education level.  (*See id.* ¶ 34).  Interviews with clients typically lasted 90 minutes.  (*See id.* ¶ 35; SMFO ¶ 35).  Only after Colyer determined how the information about a client fit together could she decide to accept the client and move forward with the claim, which she did on the basis of SSA guidelines.  (*See* SUF ¶ 36; SMFO ¶ 36).  Every time Colyer decided not to move forward with a claim, this decision had a financial impact on Freedom Disability.  (*See* SUF ¶ 37; SMFO ¶ 37).  Colyer would consult with her supervisor, who would also make decisions to close files.  (*See* SMFO ¶ 37).

Colyer's conversations with medical providers involved her asking them questions and answering questions on behalf of claimants.  (*See* SUF ¶ 38).  Colyer evaluated medical evidence to document a claimant's daily activities, functional limitations, and vocational background. (*See id.* ¶ 39).  Colyer used the information learned from a client to complete "function reports" required by SSA, to assist in determining a client's ability to function and perform routine daily activities.  (*See id.* ¶ 40).  Function reports are important and must be thorough and detailed. (*See id.* ¶ 41).  Colyer testified she would call a claimant as many times as she thought necessary. (*See id.* ¶ 42).  Colyer would e-mail back and forth with claimants.  (*See id.* ¶ 43).  Claimants asked her questions by e-mail, and she would answer.  (*See id.* ¶ 44).

Colyer has testified that she would not "guesstimate," but would be clear and objective, and would call a claimant many times to "get it right."  (SUF ¶¶ 45–46 (quoting Deposition of Jasmin Colyer, Nov. 15, 2011 ("Colyer Dep.") 34:8, 34:21–22 [ECF No. 46-12])).  Colyer would advise a claimant if additional testing would help his or her claim, and she testified it was her job

to ensure SSA got "everything that they wanted."  (SMFO ¶ 47 (quoting Colyer Dep. 37:3)).  If a claimant did not have insurance or coverage for a specific service, Colyer would research county offices, public health offices, and clinics to see if she could get the service at no cost to the claimant.  (*See* SUF ¶ 48).  Colyer's job required her to evaluate medical, vocational, and lay evidence pursuant to regulations and criteria established by the SSA.  (*See id.* ¶ 49).

Approximately 65% of initial applications are denied.  (*See id.* ¶ 52).  Claims for reconsideration of a denial are overturned at a rate of 20%.  (*See id.* ¶ 53).  At the hearing level, the rate of reversal of a denial is much greater.  (*See id.* ¶ 54).  Freedom Disability's operating policy was to "push through" initially denied cases for reconsideration; Colyer thus sent the "vast majority" of cases for reconsideration.   (SMFO ¶55).   Colyer submitted claims for reconsideration in 85% to 90% of her cases.  (*See* SUF ¶ 67).  Colyer's role in the reconsideration process was largely ministerial and involved recording and documenting information.  (*See* SMFO ¶ 56).

In filing for reconsideration, Colyer would go back to the client, collect additional or new information, and re-file the application with the SSA.  (*See* SUF ¶ 57).  She typically waited thirty to sixty days after an initial denial before filing for reconsideration.  (*See id.* ¶ 58).  She arrived at this timeline from monitoring her cases and noticing that if she filed for reconsideration too early, it would be denied.  (*See id.* ¶ 59).  Colyer therefore made the independent decision to wait at least thirty days to see if something would develop or change about a claimant's situation.  (*See id.* ¶ 60).  This would allow a client to follow up with his or her doctor or a different doctor to develop new information.  (*See id.* ¶ 61).  Colyer would consider whether the client had insurance for additional testing, whether the client could see the doctor again, the severity of the condition, and her scheduling.  (*See id.* ¶ 62).  The timing of

waiting thirty to sixty days also depended in part on what Colyer's supervisor instructed her to do.  (*See* SMFO ¶ 63).  Colyer's supervisor did not have to approve a decision to file for reconsideration, but regularly instructed her to do so as a matter of course.  (*See* SUF ¶ 64; SMFO ¶ 64).  In cases where Colyer was uncertain or the case was "borderline," she consulted her supervisor.  (SUF ¶ 66).  Colyer contacted her supervisor "nine times out of ten" about whether to go forward with a claim.  (SMFO ¶ 66).

Colyer interacted with support staff daily.  (*See* SUF ¶ 68).  The support staff supported her in her role as Disability Advocate.  (*See id.* ¶ 69).  Colyer requested client files from support staff, who processed the requests and sent them out, using the company's form rendering system ("EASE").  (*See id.* ¶ 70; SMFO ¶ 70).  Support staff typed information for Colyer, using EASE forms.  (*See* SUF ¶ 71; SMFO ¶ 71).  Support staff prepared letters and mailed paperwork to clients and agencies at Colyer's direction.  (*See* SUF ¶ 72; SMFO ¶ 72).  Colyer had support staff request medical information about clients for her using the EASE system.  (*See* SUF ¶ 73; SMFO ¶ 73).  Colyer asked support staff to e-mail the Social Security Office on her behalf, requesting information for a client's application.  (*See* SUF ¶ 74; SMFO ¶ 74).  Colyer also directed support staff to e-mail doctors' offices on her behalf requesting information.  (*See* SUF ¶ 75; SMFO ¶ 75).  Colyer testified she spent 10% of her time working on administrative matters.  (*See* SUF ¶ 77).

When Colyer applied for employment at Freedom Disability, she had a high school diploma and had taken some college courses.  (*See* SMFO ¶ 78).  When she was hired, she was assigned a cubicle and told to read the blue book, which she did for two days.  (*See id.* ¶ 79).  She did not receive formal Disability Advocate training between February 2009 and December 2010, apart from being shown how to use the company's internal case management system,

called "Aspire." (*Id.*). On days Colyer had four scheduled appointments, she regularly spent six hours on the phone with those claimants. (*See id.* ¶ 80). Colyer also made calls and sent e-mails to other claimants, doctors' offices, and the SSA throughout the day. (*See id.*). In communicating with the SSA, Colyer spent hours on the phone each day, regularly being placed on hold; she called three to five SSA agents or so-called "DDS adjudicators" each day. (*Id.* ¶ 81).

If a claimant did not answer his or her phone for a scheduled appointment, Disability Advocates were required to call the claimant a certain number of times and leave a certain number of messages, documenting each step. (*See* SMFO ¶ 82; Combined Statement of Material Undisputed Facts and Defendant's Reply . . . ("SUFR") [ECF No. 50] ¶ 82). Freedom Disability promulgated a number of different call scripts Disability Advocates were to follow in calling potential claimants. (*See* SMFO ¶ 83).

Colyer regularly carried an average workload of 250 claimants; at one point her caseload totaled 400 claimants. (*See id.* ¶ 86).

## II.   LEGAL STANDARD

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In making its assessment of summary judgment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997), and "must resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of America*, 894

F.2d 1555, 1558 (11th Cir. 1990).

      "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).  "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* at 248. Likewise, a dispute about a material fact is a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

      The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  In those cases, there is no genuine issue of material fact "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 323.

### III.   ANALYSIS

Defendant SSC contends in its memorandum in support of the Motion ("SSC Memorandum") [ECF No. 40-2] that there is no genuine issue of material fact, and that Colyer is exempt from overtime compensation under the FLSA as an administrative employee.  (*See* SSC Mem. 1).  The FLSA provides:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).  Section 207 does not apply to "any employee employed in a bona fide executive, administrative, or professional capacity."  *Id.* § 213(a)(1).  An employee is "employed in a bona fide administrative capacity" when he or she is:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . ; [and where the person's primary duty]
>
> (2) . . . is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) . . . includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a) (alterations added).  "The employer carries the burden of proving the exemption, and we narrowly construe the overtime provisions of section 207 against the employer."  *Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 625 (11th Cir. 2004).

According to SSC, Colyer meets all three of these exemption criteria and therefore is not entitled to overtime compensation under section 207.  Colyer does not dispute that she meets the

first salary-related criterion.  Rather, she contends that neither the second nor third applies to her, or that there are at least genuine issues of material fact precluding summary judgment in favor of SSC.  The Court therefore turns to each of the second and third criteria in turn.

**A.**     **Work directly related to management or general business operations**

The first issue in dispute is whether Colyer's "primary duty [was] the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers."  29 C.F.R. § 541.200(a)(2).  The regulations state:

> (a)  .  .  .  To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

> (b) Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.  Some of these activities may be performed by employees who also would qualify for another exemption.

> (c) An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers.  Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt.

*Id.* § 541.201.

*1.     Colyer's adherence to guidelines in her duties*

According to SSC, Colyer's "'primary duty'[] was spent servicing existing clients in their pursuit of disability benefits."  (SSC Mem. 4)  It is undisputed that Colyer spent approximately

85% to 90% of her day interacting with or performing work for SSC's clients.  (*See* SUF ¶ 18). SSC recites some of the facts describing Colyer's duties on behalf of clients, concluding that these types of duties are exempt.  (*See* SSC Mem. 5–7).  SSC further states that the remaining ten percent of Colyer's time was spent interacting with SSC support staff that aided her in the role of Disability Advocate.  (*See id.* 7).  SSC cites *Hogan*; *Hazel v. Michigan State Employees Association*, 826 F. Supp. 1096 (W.D. Mich. 1993); and *Hein v. PNC Financial Services Group*, 511 F. Supp. 2d 563 (E.D. Pa. 2007), as examples in which individuals with supposedly similar duties were found to be exempt.

Colyer distinguishes these cases on their facts.  The Court agrees that *Hein* and *Hazel* are distinguishable.  In *Hein*, supervision of the employee was "minimal" — he saw his manager no more than twice a month at group meetings, and communicated five to eight times a month.  511 F. Supp. 2d at 567.  More fundamentally, the employee

> was a highly trained financial consultant who managed two hundred client accounts worth between $25,000,000 and $30,000,000.  He balanced complex factors to tailor investment recommendations to his clients' needs.  He had discretion to sell any of the hundreds of investment vehicles on PNC's approved list.  He was not directly supervised, and his recommendations customarily were not reviewed.  PNC presumed that he was exercising a high degree of judgment and care.

*Id.* at 571.  As this excerpt makes clear, there is some overlap between the facts relevant to this inquiry into the second factor — the type of duty exercised by the employee — and the third factor regarding the level of discretion, which is discussed below.

In any event, Colyer clearly did not have duties akin to a highly trained investment advisor, providing individualized investment advice to clients, or deciding which investment vehicle to sell.  It is undisputed that Colyer's main duty was to assist clients with preparing applications for Social Security benefits, and she did so pursuant to specific and detailed SSA

requirements.  (*See* SUF ¶ 9; SMFO ¶ 9).  She used the blue book and other SSA materials, in

addition to external references, in her work.  (*See* SMFO ¶ 25; SUF ¶¶ 26, 27–29).  The nature of

Colyer's work was to follow guidelines and complete required function reports.  (*See* SUF ¶ 40).

The regulations state:

> The use of manuals, guidelines or other established
> procedures containing or relating to highly technical,
> scientific, legal, financial or other similarly complex matters that can be
> understood or interpreted only by those with advanced or
> specialized knowledge or skills does not preclude exemption under
> section 13(a)(1) of the Act or the regulations in this part.  Such
> manuals and procedures provide guidance in addressing difficult or
> novel circumstances and thus use of such reference material would
> not affect an employee's exempt status.  The section 13(a)(1)
> *exemptions are not available, however, for employees who simply*
> *apply well-established techniques or procedures described in*
> *manuals or other sources within closely prescribed limits to*
> *determine the correct response to an inquiry or set of*
> *circumstances.*

29 C.F.R. § 541.704 (emphasis added).  Colyer's reliance on the blue book and SSA guidelines,

therefore, seems to militate toward a finding that she was not exempt, depending on how

"closely prescribed" by guidelines her actions were.

    There is little doubt the employees in *Hein* were "advisers or consultants to their

employer's clients or customers (as tax experts or financial consultants, for example)," one of the

specific examples of an exempt class under the regulations.  29 C.F.R. § 541.201(c).  Nowhere in

the undisputed facts, however, is it shown that Colyer was similarly *advising* clients on selecting

between hundreds of different possible options, let alone in a "highly technical, scientific, legal,

financial or other similarly complex matter . . . ."  *Id.* § 541.704.  The thoroughness and detail

with which she conducted her work (*see* SUF ¶¶ 33–34), does not transform essentially fact-

finding work done pursuant to clear guidelines into "management or general business operations

of the employer or the employer's customers."  29 C.F.R. § 541.200(a)(2).  Even the most

generous reading to SSC of Colyer's duties in filling out applications for benefits would not place her on a par with an investment advisor managing multi-million-dollar accounts.  This is particularly true since, in fact, it is Colyer who is entitled to the most generous reading of the facts in determining whether the exemptions to section 207 apply.  *See Hogan*, 361 F.3d at 625.

Similarly, in *Hazel*, the employee was a "labor relations representative" who "provided representative services to members at the appellate level . . . includ[ing] investigating, documenting, negotiating and presenting complex cases."  826 F. Supp. at 1105.  She researched and investigated complaints, selected arbitrators, and worked with outside counsel, determining a "strategic approach for arguments based on case facts and research" and "evaluating proposed settlements."  *Id.* at 1106.  Notwithstanding Colyer's statement that her job was similar to that of a lawyer's, as compared with the Initial Screeners who were analogous to paralegals (*see* Colyer Dep. 62:3–9), Colyer's duties have little in common with those described in *Hazel*.  There are no facts suggesting Colyer negotiated or argued complex cases, or cases of any sort, with decision-makers.  There are no facts suggesting she selected arbitrators, evaluated settlements, or otherwise engaged in such services clearly amounting to advising or consulting for SSC's clients. The legal work performed by the employee in *Hazel* is of a very different stamp than the work Colyer undisputedly did at Freedom Disability.

The facts in *Hogan* are also easily distinguished from the instant action.  The plaintiff employees in *Hogan* "were responsible for selecting, maintaining, and supervising their own offices.  Each [employee] had to find his own location, lease or purchase said location, and handle the administrative aspects of the property."  361 F.3d at 624. They "set their own schedules and those of their employees."  *Id.*  "Their duties included promoting sales, advising customers, adapting policies to customer's needs, deciding on advertising budget and techniques,

hiring and training staff, determining staff's pay, and delegating routine matters and sales to said staff." *Id.* at 627.  Needless to say, Colyer engaged in virtually none of these types of duties, and *Hogan* is therefore inapposite.

SSC also cites *Roe-Midgett v. CC Services, Inc.* 512 F.3d 865 (7th Cir. 2008), in its Reply [ECF No. 51], a case in which the employees processed insurance claims and "spen[t] much of their time in the field without direct supervision."  512 F.3d at 868.  They were also authorized to settle claims themselves up to a $12,000 limit.  *See id.* at 869.  The lack of frequent contact with supervisors and authority to settle claims distinguish the facts in *Roe-Midgett* from those in the instant action.

The inquiry into an exemption from section 207 is highly fact- and case-specific.  The authorities cited by SSC do not compel a finding that Colyer is exempt as the employees in the cases relied on by SSC were, given the nature of her duties.  Her reliance on clear and specific guidelines weighs against an administrative employee exemption.

2.     *Administrative/production dichotomy*

As another argument against exemption, Colyer contends that rather than fitting the description of an employee engaged in management or general business operations, she "was a core production employee who worked to generate the very revenue that [SSC's] entire business is built on."  (Pl.'s Resp. in Opp'n to Def.'s Mot. ("Resp.") 2 [ECF No. 44]).  The dichotomy between administrative and production employees is found in the regulations, which distinguish between "work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201.  Thus, Colyer argues that exempt employees include those whose "primary duty is to produce the commodity, whether

goods or services, that enterprise exists to market."  (Resp. 5 (citing *Rock v. Ray Anthony Int'l, LLC*, 380 F. App'x 875 (11th Cir. 2010)); *see id.* 9 (collecting cases)).

The "administration/production dichotomy" is "but one analytical tool, to be used only to the extent it clarifies the analysis.  Only when work falls squarely on the production side of the line, has the administration/production dichotomy been determinative."  *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1127 (9th Cir. 2002) (internal quotations and citations omitted).  In the instant case, given that Colyer is not engaging in traditional production as in an assembly line, the question is not necessarily an easy one.  As the court in *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529 (2d Cir. 2009), stated:

> The line between administrative and production jobs is not a clear one, particularly given that the item being produced . . . is often an intangible service rather than a material good.  Notably, the border between administrative and production work does not track the level of responsibility, importance, or skill needed to perform a particular job.

*Id.* at 532–33.  By way of example, with respect to loan officers, opinion letters by the Department of Labor highlight the difference between "advisory duties as opposed to mere loan sales."  *Id.* at 534.  The work of an underwriter who is given a loan application and follows specified procedures to "produce a yes or no decision," but does not advise customers as to which loan products best meet their needs, concerns the "'production' of loans — the fundamental service provided by the bank," not setting "management policies" or "business operations."  *Id.*  It appears that to the extent Colyer made determinations about whether to proceed with an application or not, it amounted to a "yes or no decision," rather than providing advice as to which product might suit SSC's clients' needs.  The administrative/production dichotomy therefore appears potentially appropriate in Colyer's situation.  The Court agrees this further disfavors an exemption in Colyer's case.

>     3.     *Compensation and production incentives*

Another factor courts may consider in determining whether the exemption applies is the

nature of the employee's compensation and production incentives.  The Court in *Davis* noted that

"there is a relatively direct correlation between hours worked and materials produced in the case

of a production worker that does not exist as to administrative employees.  Paying production

incentives to underwriters shows that Chase believed that the work of underwriters could be

quantified in a way that the work of administrative employees generally cannot."  *Davis*, 587

F.3d at 535.

Colyer's production and bonus incentives are an issue of fact that the parties dispute.

Colyer asserts that SSC

> had a minimum production requirement for Disability Advocates
> that required each Advocate to submit 27–35 completed
> applications per month to the SSA.  Ex. 9: "Initial Advocate
> Compensation Presentation"; Rosenthal Dep. 33:16–24; 34:23–25;
> 35:1–2.  Defendant paid Disability Advocates bonus compensation
> based on how much they produced, including for the number of
> completed applications each month as well as every approval
> received from the SSA. Ex. 9; Rosenthal Dep. p. 33:1–7.

(SMFO ¶ 84).  SSC denies this factual characterization, stating:

> The testimony and record evidence does not support the claim that
> "[it] had a minimum production requirement for Disability
> Advocates . . . ."  Rather, Plaintiff points to Defendant's incentive
> compensation program — a program applicable to "initial/recon"
> advocates.  See, Rosenthal Dep. pp. 33:11–35:5.  Bonus pool
> eligibility was tied to program "targets," and there is no mention of
> "production requirements" or performance expectations generally.
> See, Rosenthal Dep. pp. 34:23–35:2.
>
> By way of further response, Defendant denies this statement
> because Plaintiff's compensation is immaterial as she concedes
> that the salary requirement for exempt status is not in issue. . . .

(SUFR ¶ 84).  As an initial matter, SSC's assertion that Colyer's "compensation is immaterial" is

incorrect.  (*Id.*).  It is true there is no dispute as to whether Colyer meets the first prong under 29 C.F.R. § 541.200(a) with respect to her overall salary level.  Nonetheless, her production requirements and incentives are relevant to her status as an exempt or non-exempt employee, as the *Davis* court explained.

Upon having reviewed the record, the Court finds Colyer's characterization of the facts to be a reasonably accurate one.  While SSC suggests that Rosenthal did not refer to any production requirement for Disability Advocates, but limited her remarks to "initial/recon" advocates (*id.*), a review of Rosenthal's deposition makes clear she is discussing compensation and production incentive programs for Disability Advocates in place at the time Colyer was employed at Freedom Disability.  (Deposition of Evelyn Rosenthal, Nov. 14, 2011 ("Rosenthal Dep.") 32:6–19[2]; [ECF No. 46-13]; Initial Advocate Compensation Presentation [ECF No. 46-9]).  In fact, she clearly discusses production requirements for Disability Advocates in the following exchange:

> Q: And are you able to describe a range of what application minimums were between, let's say, 2008 and 2011?
>
> A: I'm thinking because they have changed, so give me a minute. There was a minimum production standard of 25 applications.  The goal was 35 applications a month.  However, if an advocate only

---

[2]  The following exchange was recorded:

> Q: Is this incentive or is this advocate compensation presentation that includes information on incentive pay, is it consistent with bonus structures that were in place between 2009 and 2011, when Miss Colyer was employed?
>
> A: This is one of the plans.
>
> Q: Before we get into looking at the nuts and bolts that are in these pages, are you able to provide a brief description *of what the main components of bonus compensation for disability advocates typically entail*?
>
> A: Yes.   There's a portion based on quality, *a portion based on production* and a portion based on customer service.

(Rosenthal Dep. 32:6–19) (emphasis added).

submitted 25, we allowed them to participate in the bonus comp
for that month.

\*       \*       \*

Q: Has 35 as the goal been, based upon your recollection and
experience, a fairly consistent measure?

A: Yes.

Q: And that was reinforced with disability advocates that 35 is the
goal?

A: Yes.

(*Id.* 33:16–35:12).

Although SSC argues Rosenthal was discussing "initial/recon" advocates instead of
Disability Advocates, Rosenthal's deposition makes clear that this term refers to initial SSA
approvals and reconsiderations, which are undisputely within the scope of the Disability
Advocates' work.  (*See id.* 34:7–18).  The presentation Rosenthal discusses in the deposition,
setting forth Freedom Disability's compensation policy, also states that "[s]upervisors monitor
rolling approval rate for improvement and minimum performance levels," and that "[m]inimum
production must be met."  (Initial Advocate Compensation Presentation 3).  It further declares,
"It is relatively simple.  There is only one metric for advocates & management to calculate pay
out on — number of approvals."  (*Id.* 4) (emphasis in original).  Moreover, Freedom Disability's
incentive plan "[p]rovides direct incentive for higher approval volumes."  (*Id.*) (emphasis in
original).

Colyer has set forth facts showing that Disability Advocates were paid production
incentives, and that their work was therefore "quantified in a way that the work of administrative
employees generally" is not.  *Davis*, 587 F.3d at 535.  Since SSC does not dispute the validity of
the sources on which Colyer relies, the Court deems this fact undisputed and admitted.

For the above reasons, the Court finds the undisputed facts disfavor a finding that Colyer's "work [was] directly related to the management or general business operations of the employer or the employer's customers."  29 C.F.R. § 541.200(a).  SSC has not shown Colyer meets this essential criterion of the administrative exemption test.  While the above discussion is dispositive of the Motion, the Court briefly addresses the third criterion as well.

### B.   Exercise of discretion and independent judgment

SSC contends that Colyer exercised discretion and was able to "commit [SSC] in matters that had a substantial impact on [SSC's] business operations as well as her clients' bottom line." (SSC Mem. 10).  With respect to the exercise of independent judgment, SSC largely points to Colyer's supposed discretion over client appeals or reconsideration applications as proof.  (*See id.*).  SSC notes the timing of Colyer's decisions to file for reconsideration — Colyer usually waited between thirty and sixty days after an initial denial to file for reconsideration.  (*See id.* ¶ 58).  SSC states that Colyer's decision to wait this period was "based on judgment and experience" (SSC Mem. 11), as she acted on past experience that cases filed too soon for reconsideration would be denied (s*ee* SUF ¶ 59).  SSC cites *Roe-Midgett* to note that a plaintiff's duties need only *include* (as opposed to entirely consist of) the exercise of discretion and independent judgment.  (*See* SSC Mem. 10).

The Court does not find that undisputed facts clearly demonstrate that Colyer exhibited sufficient discretion and independent judgment to qualify for an administrative exemption. Colyer filed for reconsideration in 85% to 90% of her cases.  (*See* SUF ¶ 67).  Freedom Disability's policy was to "push through" initially denied cases for reconsideration.  (SMFO ¶ 55).  Although her supervisor was not required to approve decisions to file for reconsideration, her supervisor regularly instructed her to do so as a matter of course.  (*See id.* ¶ 64; SMFO ¶ 64).

Moreover, when Colyer was uncertain or the case was "borderline," she consulted her supervisor.  (SUF ¶ 66).  In fact, it is undisputed that Colyer contacted her supervisor "nine times out of ten" to see whether she should go forward with a claim.  (*See* SMFO ¶ 66).

Given these facts, it does not appear that Colyer made sufficiently independent decisions to be an administrative employee, as she was not "free from immediate direction or supervision." 29 C.F.R. § 541.202.  The Court takes into consideration the regulations' guidance that exempt administrative employees need not have "unlimited authority and a complete absence of review," and that they may make "recommendations for action rather than the actual taking of action."  *Id.* Nevertheless, the choice to proceed with reconsideration appears more or less to be a yes-or-no binary decision.  The undisputed facts that Colyer decided "yes" in 90% of cases, that it was Freedom Disability's policy to send cases for reconsideration, that in the event of uncertainty and nine times out of ten she consulted her supervisor, all strongly suggest Colyer cannot be said to have exercised the discretion of an administrative employee in sending cases for reconsideration. Rather, it appears that the reconsideration decision was routine and matter-of-course, and that to the extent judgment was required, Colyer looked to her supervisor.  Thus, the undisputed facts do not demonstrate that Colyer exercised the discretion and independent judgment of an exempt employee.

Case No.  11-20984-CIV-ALTONAGA/Simonton

## IV.    CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendant's Motion **[ECF No. 40]** is **DENIED**.

**DONE AND ORDERED** in Chambers in Miami, Florida on this 14th day of March,

2012.

_Cecilia M. Altonaga_

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record